# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

MATTHEW MENARD and
MATADOR LLC d/b/a VAUGHN
ASSOCIATES MN,

      Plaintiffs,

v.

BESTWAY (USA), INC., and BESTWAY
INFLATABLES AND MATERIALS
CORP.,

      Defendants.

Case No. 15-cv-2931 (JNE/SER)
MEMORANDUM
**(FILED UNDER SEAL)**

---

Michael W. Weaver and Kaitlin P. Sheehan, McDermott Will & Emery, and Laura A. Pfeiffer, Winthrop & Weinstine, appeared for Defendants Bestway (USA), Inc., and Bestway Inflatables and Materials Corp.

Daniel L. Scott, Stinson Leonard Street LLP, appeared for Plaintiffs Matthew Menard and Matador LLC d/b/a Vaughn Associates MN.

---

Plaintiffs Matthew Menard and Matador LLC d/b/a Vaughn Associates MN ("Vaughn MN"), bring this action for breach of contract and violation of two Minnesota statutes relating to sales representatives, Minn. Stat. §§ 325E.37 and 181.145. *See* Compl., Dkt. No. 1. Defendants Bestway (USA), Inc. ("Bestway USA"), and Bestway Inflatables and Materials Corp. ("Bestway China") move for summary judgment on all claims [Dkt. No. 49]. For the reasons set forth below, the Court denies the motion.

## I.    LEGAL STANDARD

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the

absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must view genuinely disputed facts in the light most favorable to the nonmovant, *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009), and draw all justifiable inferences from the evidence in the nonmovant's favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## II. DISCUSSION

This case concerns whether Plaintiffs were fully compensated for their work in helping Defendants sell airbed products into the retailer Target Corp. ("Target").

### A. Summary of the Claims

Reviewing the allegations provides helpful context to Defendants' motion for summary judgment on each of the Complaint's claims. Plaintiffs allege that in 2011, they entered into a "Joint Marketing Agreement" with Vaughn Associates, Inc. ("Vaughn, Inc."), a separate organization from Vaughn MN. Plaintiffs and Vaughn Inc. agreed to work together to represent manufacturers, including Defendants, in the sale of their products to retailers in Minnesota and other states. In 2012, Defendants "engaged Vaughn and Plaintiffs to act as sales representatives in order to sell airbeds" to Target. Compl. ¶ 12. That same year, Plaintiffs secured an agreement for Target to buy a year's worth of airbeds from Defendants in 2012 through 2013. "In connection with [the] sale of Defendants' products to Target, Plaintiffs were entitled to receive 2% of all airbed sales as a sales commission." Compl. ¶ 13. In July 2013, Plaintiffs secured a second agreement for Target to buy two years' worth of airbeds and pumps from Defendants in 2014 through 2016. "In connection with this deal, Plaintiffs were entitled [to] receive 2% of all

2

2014 shipments and 3% of all 2015 shipments of Defendants' products to Target." Compl. ¶ 15. "Thus, Plaintiffs entered into a sales representative agreement with Defendants to receive commissions in the amount of 2% of all of Defendants' 2013 shipments to Target, 2% of Defendants' 2014 shipments to Target, and 3% of all of Defendants' 2015 shipments to Target." Compl. ¶ 16. In December 2013, Defendants "purported to terminate Plaintiffs' sales representative agreement." Compl. ¶ 18. Defendants paid Plaintiffs approximately $130,000 in sales commissions for 2014 sales, which Plaintiffs allege was insufficient. Defendants failed to pay any commissions for Defendants' 2015 sales to Target.

Plaintiffs' claims are threefold. In Count I, they allege that "Plaintiffs and Defendants entered into a 'sales representative agreement,' as that term is defined within Minn. Stat. § 325E.37, under which Plaintiffs were granted the right to represent, sell, and offer for sale Defendants' products to customers, including Target, and under which Plaintiffs were and are to receive commissions on all sales of Defendants' products to the same." Compl. ¶ 24. Plaintiffs allege that Defendants never properly terminated the agreement, but rather "purported to terminate the parties' sales representative agreement without notice." Compl. ¶ 27. In Count II, Plaintiffs allege that they are parties to a contract with Defendants "which requires Defendants to pay Plaintiffs commissions at the rate of 2% for all of Defendants' 2014 shipments to Target, and 3% for all of Defendants' 2015 shipments to Target." Compl. ¶ 33. They allege that Defendants breached the contract by failing "to pay Plaintiffs' commissions for all of Defendants' 2014 and 2015 Target shipments." Compl. ¶ 34. In Count III, Plaintiffs allege that they are "commission salespersons as defined under Minn. Stat. § 181.145" and that they have not been paid the commissions earned before Defendants terminated them. Compl. ¶¶ 37-39.

## B. Summary of Undisputed Facts and Preview of Dispute

In November 2011, Plaintiffs and Vaughn, Inc., entered into a Joint Marketing Agreement. *See* Sheehan Decl. Ex. P, Dkt. No. 66. The agreement states that the Minnesota-based Plaintiffs and the Illinois-based Vaughn, Inc., would work together in the business of representing manufacturers, "shar[ing] certain product lines and the compensation generated therefrom in accordance with the provisions hereof so as to appear, for marketing purposes, as though they are a single entity." *Id.* at '757. It states that Vaughn, Inc., and Vaughn MN "shall enter into separate agreements with all of the Vaughn Factories, it being the understanding and agreement of the parties hereto that each shall have independent relationships with" the identified manufacturers. *Id.* at '757-758. "Best Way" was identified as a "potential new" manufacturer "in Minnesota" for Vaughn, Inc. *Id.* at '764. Vaughn, Inc., had a preexisting sales representative relationship with Defendants, but Defendants had never successfully sold into Minnesota-based Target.

In January 2012, at the introduction of Vaughn, Inc.'s president Tom Strauss, Menard met with the then-head of Bestway USA, Danny Kwok, in Hong Kong. The parties' accounts diverge significantly at this point. According to Menard, he told Kwok that his company Vaughn MN was separate from Vaughn, Inc., and that he would need a separate contract and should be paid directly. *See* Menard Dep. 22:4-22:17, Sheehan Decl. Ex. C, Dkt. No. 56. Kwok hired him on the spot as sales representative to Target based on an oral agreement that Bestway[1] would pay Vaughn MN a three percent commission on all shipments by Bestway to Target. Menard Dep. 22:18-22:25, 34:9-34:11. According to Defendants, they were never informed that

---

[1] Bestway USA and Bestway China are affiliated. Menard testified that he did not know which entity or entities he came to an agreement with. Menard Dep. 23:3-23:18. The Court refers to "Bestway" where it is unclear from the briefing or record which entity was referenced.

Menard operated a separate company. Rather, they understood Menard to be a Minnesota-based employee of Vaughn, Inc., and proceeded accordingly, without entering into any agreement with Menard or Vaughn MN. *See* Defs.' Br. 3-4, 7-8, Dkt. No. 52.

After Menard's January meeting with Kwok, he began to promote Bestway's products to Target. *See* Defs.' Br. 4; Pls.' Br. 10, Dkt. No. 72. On July 20, 2012, Target informed the parties that it was committing to purchase a year's worth of airbeds from Defendants. Defs.' Br. 4; Pls.' Br. 10.

Shortly after receiving the news from Target, on July 23, Menard emailed Kwok the following message: "Now that we for sure have business, we should get a contract signed by both of us. Attached is the standard contract I use with my vendors, please review and let me know if ok." Sheehan Decl. Ex. D, at '111, Dkt. No. 57. The draft contract provided for commissions at the rate of three percent. *See* Sheehan Decl. Ex. T, at '704, Dkt. No. 68; Defs.' Br. 22. Kwok replied,

> We don't utilize rep agreement[s] with any of our reps, all of our agreements with Tom [Strauss] and Vaughn Associates since the beginning of this cooperation are done via email confirmation. . . .
>
> I have had discussion with Tom before, due to the competitive nature of this account[,] the commission rate for all of Target's business in 2013 and 2014 will be 2% flat.

Sheehan Decl. Ex. D, at '110-111. Kwok did not sign the written contract that Menard had emailed. No Bestway USA or Bestway China representative ever signed a written agreement with Menard or Vaughn MN. On July 31, 2012, Strauss responded to this email chain, addressing Kwok: "As we discussed everyone understands our agreement[s] are by email and are 1 year automatically renewing deals. It appears you told Matt the rate was 3%, I explained that we are not 3% and it is 2% until you can persuade Shanghai to increase our rate . . . ." *Id.* at '110. Strauss also informed Kwok that Bestway would need to pay commissions for Target sales

5

to "a different corporate account" because "[w]e have a tax and accounting issue if the funds are not sent directly to the Minnesota bank account." *Id.*

On December 19, 2012, Menard emailed Kwok, "As we discussed, below is the banking info for where to wire the Target Commissions," providing routing information for an account beneficiary referred to as "Vaughn Associates." Sheehan Decl. Ex. E, Dkt. No. 58.

In 2013, Patrick Fumagalli replaced Kwok as head of Bestway USA. On April 23, 2013, Menard emailed Kwok, "As we discussed in Shanghai, if Bestway is fine having two separate contracts, I would like to get ours taken care of. Attached is the standard contract I use, please review and let me know if ok." Sheehan Decl. Ex. F, Dkt. No. 59. He added that he had "still seen nothing yet on commissions" and asked for a status update. *Id.* Kwok replied, "I would ask you to send the agreement issue [to] sort out with Patrick [Fumagalli] directly." *Id.*

Vaughn, Inc., and Bestway USA signed an "engagement letter" dated April 26, 2013. Sheehan Decl. Ex. H, Dkt. No. 61. The document states that "Vaughn Associates, Inc. will be responsible for managing" Target. *Id.* at '448. The document specifies sales commission rates for the Target account at 2%, with an increase "to 3% for shipments after 1-1-2015." *Id.* at '445.

On May 1, 2013, Strauss emailed Menard, "FYI – Best way is all done. 3 years, target (as was the original agreement) 2%, converts to 3% 1-1-2015. The termination clause is 1 1/2% – period of 4 months for every year we have covered the account, maximum of 1 full year of commissions." Sheehan Decl., Ex. I, at '312, Dkt. No. 62.

In July 2013, Target committed to buying an additional two years' worth of Bestway's products, from February 2014 through January 2016. *See* Compl. ¶ 15; Fumagalli Dep. 175:13-175:22, Sheehan Decl. Ex. A, Dkt. No. 54.

In a letter dated December 9, 2013, Fumagalli wrote Strauss at "Vaughan Associates" (sic) in Illinois that "[p]er our conversation and as verbally agreed, this letter is to confirm the termination of agreement on the Target account. As agreed, Bestway will continue to pay commission to Vaughan [sic] Associates on this account until 12/31/2014." Sheehan Decl. Ex. K, Dkt. No. 53-4. Fumagalli called Menard to tell him that Bestway was terminating the relationship. *See* Menard Dep. 39:16-39:19, 160:23-161:9; Fumagalli Dep. 166:6-166:12.

Bestway paid Menard some commissions on sales for calendar years 2013 and 2014. *See* Compl. ¶¶ 17, 20 (alleging payments of approximately $165,000 for 2013 and $130,000 for 2014); Menard Dep. 81:11-81:12 ("They paid me over $300,000 in a, you know, short period of time, relatively."); Defs.' Br. 27 (citing documents regarding payments).

### C. Analysis

#### a. Variance Between Contract Allegations and Plaintiffs' Theory at Summary Judgment

Defendants first argue that Plaintiffs failed to prove the agreement they alleged and that because all three claims are premised on the existence of that agreement, summary judgment must be granted on all claims. There are clear differences between the contract terms alleged in the Complaint and what Plaintiffs now argue that the record proves. The Complaint alleges a sales representative agreement pursuant to which Defendants agreed to pay Plaintiffs two percent of Defendants' 2013 shipments to Target, two percent for 2014, and three percent for 2015. Compl. ¶ 16. It alleges underpayments for 2014 and 2015. *See* Compl. ¶ 34. Yet Plaintiffs now disavow that they ever agreed to such terms, argue that they have proved the existence of a contract with different terms, and claim underpayments beginning in 2013. Their current position is clear: they formed an oral contract with Bestway in January 2012, and it is "the only agreement that has ever existed between the parties . . . ." Pls.' Br. 17. To grant summary

7

judgment on all claims because of the pleading discrepancies would, however, be unwarranted on this record. Defendants also argue that, even ignoring the variance, Plaintiffs have not pointed to record evidence that could establish the existence of any contract between them and Defendants. The Court reaches a different conclusion.

The elements of a cause of action for breach of contract are: (1) a valid contract, formed by offer, acceptance, and supported by consideration; (2) performance by plaintiff; (3) breach by defendant; and (4) that plaintiff has sustained damages as a result of the breach. David Herr, 28 Minn. Prac., *Elements of an Action* § 4:1 (Dec. 2016); *see also Thomas B. Olson & Assocs., P.A. v. Leffert, Jay & Polglaze, P.A.*, 756 N.W.2d 907, 918 (Minn. Ct. App. 2008); *Jensen v. Duluth Area YMCA*, 688 N.W.2d 574, 578-79 (Minn. Ct. App. 2004). A signed agreement is not required for contract formation. *Powell v. MVE Holdings, Inc.*, 626 N.W.2d 451, 462 (Minn. Ct. App. 2001).

The Court first considers whether a reasonable factfinder could find that Plaintiffs formed an oral contract with Bestway in January 2012. Plaintiffs point to evidence in the record that, viewed in a light most favorable to them, supports their current theory. Menard testified consistently that the only agreement he ever made with Bestway was an oral agreement he reached with Bestway USA executive Kwok in Hong Kong in 2012, pursuant to which Bestway agreed to pay three percent commissions on all net shipments to Target. *See, e.g.*, Menard Dep. 34:6-35:7, 89:16-89:23, 248:9-248:10. As corroboration he also cites Strauss's July 31, 2012, email to Kwok stating that "[i]t appears you told Matt the rate was 3% . . . ." Similarly, the draft contract that Menard apparently sent to Kwok in July 2012 provided for three percent commissions. The November 2011 Joint Marketing Agreement appears to indicate that Plaintiffs and Vaughn, Inc., agreed that Vaughn MN would reach its own agreements with manufacturers.

8

Menard testified that in his January 2012 meeting with Kwok, he informed Kwok that he had a separate organization and would need a separate contract from Vaughn, Inc. Menard Dep. 22:6-22:17. Moreover, Menard notes that after the January 2012 meeting, he got to work, as evidenced by Target's July 2012 decision to order a year's worth of airbeds. As a final example, in an April 29, 2015, email to Menard, Fumagalli referred to "all the considerations and agreements that have been taken at that time and that have been agreed by you." Scott Decl. Ex. E, at '538, Dkt. No. 79. Fumagalli reiterated, "This has been agreed *by you*." *Id.* (emphasis added). Although Fumagalli's email appears to have been referring to the 2013 timeframe, which might not support the 2012 contract theory, this email arguably indicates that Bestway understood Menard to be negotiating and agreeing to terms on his own behalf, contrary to Defendants' defense that they negotiated only with Vaughn, Inc. Drawing justifiable inferences in Plaintiffs' favor, a reasonable factfinder might find that materials in the record evidence a January 2012 agreement between Plaintiffs and Defendants for Bestway to pay Plaintiffs a three percent commission on Target sales.

Many of Defendants' arguments can be distilled into a request that the Court interpret some materials in the record as establishing that there was no 2012 oral agreement. For example, Defendants cite Kwok's refusals to sign the written contracts that Menard emailed in July 2012 and April 2013, urging the Court to infer that there must not have been an oral agreement. They also suggest that Menard's reaction to and testimony about Strauss's April 2013 negotiations with Bestway undermine Menard's assertions about the existence and terms of the oral contract. This type of argument, which asks the Court to evaluate the strengths and weaknesses of materials in the record, only demonstrates that there are genuine disputes of material fact.

9

Defendants also seek to discount the probative value of Menard's testimony as self-serving. Credibility determinations are for the factfinder. *E.g.*, *Nunn v. Noodles & Co.*, 674 F.3d 910, 914 (8th Cir. 2012). Moreover, unlike parties in some of the cases that Defendants cite, Menard does not rely solely on "[his] own contradictory testimony," *Reed v. City of St. Charles*, 561 F.3d 788, 791 (8th Cir. 2009). Nor does Menard rely merely on an affidavit (much less an affidavit contradicting his deposition testimony), *see Knudsen v. United States*, 254 F.3d 747, 752 (8th Cir. 2001), nor on allegations or contentions, *see Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (quoting *Bass v. SBC Commc'ns, Inc.*, 418 F.3d 870, 872 (8th Cir.2005), for the proposition that "[a] plaintiff may not merely point to unsupported self-serving allegations"). In *Bass*, the plaintiff unsuccessfully resisted summary judgment by relying on "his own statements" and "assert[ions]" that he could have returned to work, without pointing to supporting evidence in the record and in direct contradiction to his own deposition testimony. 418 F.3d at 873. In Menard's deposition, he acknowledged that the Complaint's allegations as to the contract terms were inaccurate but consistently testified that Plaintiffs and Bestway reached an oral agreement in 2012 for a three percent commission rate, which is the position he takes at summary judgment. *See* Menard Dep. 245:7-245:24. He also cites other support in the record. The cases Defendants cite are thus distinguishable.

Defendants also argue that the facts in the record cannot support a finding that any January 2012 oral agreement was sufficiently definite. "The essential terms of the offer must be reasonably clear, definite, and certain." 4 Minn. Prac., *Jury Instr. Guides–Civil* § 20.15 (6th ed. Sept. 2017); *see also* 1 *Williston on Contracts* § 3:2 (4th ed. May 2017) (stating that a required element of an agreement is that "the essential terms of the agreement are sufficiently definite to be enforced"). However, "[a] contract will not fail due to indefiniteness if the parties intended to

10

make a contract, and there is a reasonably certain basis for giving an appropriate remedy." *Jury Instr.*, *supra*, § 20.15. Menard testified that he and Kwok agreed on the "basic principles" or "big-picture" items: He would work to sell Bestway products to Target for compensation of "3 percent payable to me on all shipments to Target," meaning all "net shipments," to be paid to Vaughn MN 30 days after Bestway's receipt of payment from Target, for an indefinite duration. Menard Dep. 30:3-30:5, 32:19-37:16. Defendants assert that many different contractual provisions appear not to have been decided or included, such as which specific entities would be parties (Menard individually or Vaughn MN; Bestway USA or Bestway China), and provisions on choice of law, dispute resolution, assignment, limitation of liability, and modification. However, the facts that Menard started working to secure the Target commitment after the January meeting, and that Bestway paid him some commissions for his work, could be interpreted as showing that the oral agreement was sufficiently definite to be enforced. *See Cont'l Bank & Tr. Co. v. Am. Bonding Co.*, 605 F.2d 1049, 1054 (8th Cir. 1979) ("[I]ndefiniteness can be cured by the subsequent conduct of the parties . . . .") (applying Missouri law); *Hill v. Okay Const. Co.*, 252 N.W.2d 107, 114 (1977) (Minn. 1977) ("The law does not favor destruction of a contract for indefiniteness. That maxim is especially true where, as here, there has been such extensive performance on the part of both parties.") (citation omitted). Which specific entities were parties to the agreement would be a question for the jury. And Bestway does not convincingly explain why a choice-of-law provision or other provisions found in more complex contracts are essential for an agreement to be definite. *See Hill*, 252 N.W.2d at 114. Viewing the facts most favorably to Plaintiffs, genuine issues of material fact remain regarding contract formation and terms.

There remains to discuss the potential problem that Plaintiffs pleaded an agreement with different terms than three percent commission rates starting in 2013. Summary judgment is evaluated based on a plaintiff's claims. *See, e.g.*, Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim . . . on which summary judgment is sought."); *Adam v. Stonebridge Life Ins. Co.*, 612 F.3d 967, 971 (8th Cir. 2010) ("To survive summary judgment, a plaintiff must *substantiate his allegations* with enough probative evidence to support a finding in his favor.") (citation omitted and emphasis added). "[F]actual statements in a party's pleadings are generally binding on that party unless the pleading is amended." *Knudsen*, 254 F.3d at 752 (citation omitted). It is indisputable that Plaintiffs have not proved the contract terms pleaded in Count II for two percent rates in 2013 and 2014 and three percent in 2015. But they have pointed to evidence that could support a finding that a contract with different terms existed and was breached. Moreover, setting aside the dispute about rates, there are separate disputes about whether the commission payments that were made were calculated correctly and whether Defendants should have paid commissions on 2015 sales.

Granting summary judgment on Count II would therefore be inappropriate as well as inconsistent with the modern pleading regime. A plaintiff may plead in the alternative and may even plead alternative contracts. *See, e.g.*, Wright & Miller, 5 *Fed. Prac. & Proc. Civ.* § 1235 (3d ed. 2017). The rules for amending a complaint are liberal. *See* Fed. R. Civ. P. 15(a)(2) (providing for the court to "freely give leave" to amend "when justice so requires"). A plaintiff may even amend his complaint to conform with evidence presented during trial. *See* Fed. R. Civ. P. 15(b)(1). Rule 15(b) is intended to "promote the objective of deciding cases on their merits rather than in terms of the relative pleading skills of counsel or on the basis of a statement of the claim . . . that was made at a preliminary point in the action and later proves to

be erroneous." Wright & Miller, *supra*, § 1491; *see also Am. Family Mut. Ins. Co. v. Hollander*, 705 F.3d 339, 348 (8th Cir. 2013). Defendants do not argue that they have been or will be prejudiced. Amendment would not be futile given that there is some evidence in the record that could support a finding that an 2012 oral agreement existed. *See U.S. ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 557 (8th Cir. 2006) ("[D]enial of leave to amend may be justified by undue delay, bad faith on the part of the moving party, futility of the amendment or unfair prejudice to the opposing party.").[2]

Defendants insist that Plaintiffs' failure to plead the 2012 oral agreement tarnishes Menard's credibility, but credibility determinations are for the factfinder. The jury may consider the pleading as an admission and decide how to weigh it. *See First Bank of Marietta v. Hogge*, 161 F.3d 506, 510 (8th Cir. 1998).

Granting summary judgment on the entire action in favor of Defendants because of a pleading discrepancy is unmerited and would be unduly harsh. Significantly, Defendants' motion for summary judgment on Counts I and III relies on their argument that Plaintiffs have failed to show that they could establish any agreement with Defendants, including the agreement pleaded in the Complaint. *See, e.g.*, Defs.' Br. 24. But because a reasonable factfinder could find a January 2012 contract, the statutory claims do not necessarily fail for lack of proof of an

---

[2] Plaintiffs assert that they "can amend the Complaint if the Court deems it necessary to conform to the evidence." Pls.' Br. 19 n.5. Plaintiffs must comply with the Federal and Local Rules to amend their Complaint. *See* Fed. R. Civ. P. 15(a)(2); D. Minn. L.R. 15.1. It appears that in this Circuit, the mechanism of Rule 15(b) is unavailable to parties during pretrial proceedings. *See Cook v. City of Bella Villa*, 582 F.3d 840, 852 (8th Cir. 2009); *Oglala Sioux Tribe of Pine Ridge Indian Reservation v. Hallett*, 708 F.2d 326, 329 n.5 (8th Cir. 1983). Although according to the Fourth Amended Pretrial Scheduling Order in this case, the deadline for moving to amend the pleadings has passed, the Court will allow Plaintiffs to, no later than two weeks from the date of this Memorandum and accompanying Order, move to amend their pleadings to be consistent with the theories asserted at summary judgment. Such an amended complaint will assist in the parties' preparation for trial.

underlying agreement. Moreover, although the pleadings as to Count II specifically reference the different commission rates, the pleadings as to the statutory claims in Counts I and III allege more generally violations based on the "parties' sales representative agreement" or failure to pay for "commissions due and owing." *See, e.g.*, Compl. ¶¶ 27, 39.

### b. Defendants' Waiver Argument

Defendants argue that even if there had been a 2012 agreement to pay three percent commissions, by accepting multiple commission payments at the rate of two percent without protest, Menard waived the right to sue for breach of contract as to the missing one percent. They do not cite any case applying Minnesota law.

"Waiver is the intentional relinquishment of a known right." *Frandsen v. Ford Motor Co.*, 801 N.W.2d 177, 182 (Minn. 2011) (citation omitted). "Therefore, a valid waiver requires two elements: (1) knowledge of the right, and (2) an intent to waive the right." *Id.* (citation omitted). Waiver may be inferred from conduct. *Id.* "The burden of proving knowledge and intent rests with the party asserting waiver." *Id.* (citation omitted). Waiver is "ordinarily a question of fact for a jury, unless only one inference may be drawn from the facts." *Pollard v. Southdale Gardens of Edina Condo. Ass'n, Inc.*, 698 N.W.2d 449, 453 (Minn. Ct. App. 2005) (citation omitted).

Menard testified that he did not simply accept the two percent payments, but rather asked his business partner Strauss, who had the longer relationship with Bestway, to advocate on his behalf about the commission rate. *E.g.*, Menard Dep. 101:13-101:15, 177:21-178:2; *see also* Sheehan Decl. Ex. I (referencing Strauss's efforts to increase the commission rate). It is also worth noting that as late as April 2013, when he again emailed a draft written contract to Kwok, it appears that Menard had not received any commission payments at all.

14

The question of waiver in this case is one for the factfinder and does not support the entry of summary judgment.

### c. Defendants' Damages Arguments

Defendants also assert that Plaintiffs cannot prove any damages, which is an essential element of a breach of contract claim. *See Elements of an Action*, *supra*, § 4:1. They contend that under any contract that arguably could have applied, Plaintiffs would not have been entitled to more than what Defendants already paid them.

Defendants walk through mathematical calculations based on several assumed contractual scenarios. They posit that under any hypothetical contract, Plaintiffs cannot show damages because Plaintiffs have already been paid generously. This exercise is unavailing because Defendants, the moving parties, have not established a foundation for the documents on which they based the calculations. *See Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 636 n.20 (8th Cir. 2000); *see also MRO Indus. Sales, LLC v. Carhart-Halaska Int'l, LLC*, No. 12-cv-2401 (MJD), 2013 WL 5781469, at *7-9 (D. Minn. Oct. 25, 2013) (denying summary judgment on breach of contract and Minnesota statutory claims where the parties did not point to definitive evidence showing the amounts of commission owed and the record was vague and conflicting). Moreover, none of Defendants' calculations account for payments based on Target sales in 2015.

Relatedly, Defendants argue that Plaintiffs have not pointed to evidence that could prove that they were owed more money than they already received. Defendants protest that Plaintiffs merely cite to rough sales estimates from Fumagalli's deposition testimony, rather than to actual figures produced in discovery. There are genuine issues of fact over whether Plaintiffs were owed commissions at the rate of three percent, how the commissions should have been calculated, and whether they are owed commissions for 2015. Thus, Plaintiffs have met the test

of showing that they *could* be entitled to damages for a loss. *See Children's Broad. Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1016 (8th Cir. 2001). And there were documents produced in discovery from which the jury might reasonably determine the extent of damages, if any. *See* Def.'s Reply 10-11, Dkt. No. 81 (asserting that documents were produced from which the amounts due may be calculated); *Children's*, 245 F.3d at 1016-17; *Jensen*, 688 N.W.2d at 579.

The Court therefore cannot grant summary judgment based on these damages arguments.

### d. Defendants' Argument About 2015 Commissions

Defendants maintain that Plaintiffs under no circumstances were entitled to commissions for 2015.

It is an undisputed fact that Target committed to two years' worth of sales in 2013—before Defendants wrote Vaughn, Inc., and called Menard to advise that they were no longer going to use him as their sales representative with Target. Plaintiffs claim that they are entitled to commissions based on sales to which Target committed in 2013. *See* Compl. ¶ 18. Menard testified that under the 2012 oral agreement, "if a program were sold in, [he was] entitled to get paid for that entire program . . . ." Menard Dep. 31:10-31:13. The draft written contract that Menard sent to Kwok in July 2012, which Menard testified was intended to "put in writing the verbal agreement [he] had," Menard Dep. 15:17-15:18, similarly provided that "[u]pon termination of this Agreement, Commissions shall be due . . . for all sales completed *or documented as pending*, prior to and including, the termination date," Sheehan Decl. Ex. T § 5.3 (emphasis added). These parts of the record demonstrate a material issue of fact as to the breach of contract claim. This factual dispute underpins the statutory allegations, too. *See* Minn. Stat. § 325E.37, subd. 4 (providing that a sales representative is entitled to commissions on "all sales as to which the representative would have been entitled to commissions . . . made prior to the date

16

of termination of the agreement or the end of the notification period, whichever is later, *regardless of whether the goods have been actually shipped*.") (emphasis added).

Moreover, Menard alleges that Defendants terminated the sales representative relationship with Plaintiffs without proper notice. Compl. ¶ 18. *See* Minn. Stat. § 325E.37, subd. 4 (providing that unless termination is for good cause, an agreement of indefinite duration may be non-renewed by giving "written notice of intention not to continue the agreement"). Defendants have not pointed to any document in the record showing that Menard received written notice of termination. They have argued that they understood Vaughn, Inc., to be Menard's employer and have implied that Strauss was acting as an agent for Vaughn MN. Based on the record before it, viewing genuinely disputed facts in the light most favorable to Plaintiffs, Court cannot find as a matter of law that Plaintiffs received written notice of termination. This question is for the factfinder.

### III. CONCLUSION

The Court will issue a separate order that is consistent with this Memorandum.

Dated: September 15, 2017     s/ Joan N. Ericksen
                              JOAN N. ERICKSEN
                              United States District Judge